## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DAVID STEPHENS** and
**STACEY STEPHENS**,

        Plaintiffs,

    vs.                               No.    **CIV 04-1168 MCA/RHS**

**GEICO INDEMNITY COMPANY**,
a foreign corporation,

        Defendant.

### MEMORANDUM OPINION AND ORDER

      **THIS MATTER** comes before the Court on *Defendant's Motion for Summary Judgment* [Doc. No. 191] filed on August 11, 2005, and Plaintiffs' *Opposed Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment on GEICO's Affirmative Defenses and Memorandum in Support* [Doc. No. 189] filed on August 11, 2005.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court determines that Defendant is entitled to summary judgment on all of Plaintiffs' claims for the reasons set forth below.  Therefore, Defendant's motion is granted, Plaintiffs' motion is denied, and this action is dismissed with prejudice.

### I.    BACKGROUND

      The history of this litigation is set forth in the *Memorandum Opinion and Order* [Doc. No. 101] filed on May 20, 2005.  After that date, the parties engaged in further discovery and

filed dispositive motions.   [Doc. 189, 191.]  The undisputed facts and evidence of record, as amended to include the results of additional discovery and briefing on the dispositive motions, can be summarized as follows.

On or about May 13, 2004, Plaintiff David Stephens notified Defendant GEICO Indemnity Company of a claim for the loss of his 1994 Toyota Supra automobile due to theft. [Ex. B, C to Doc. 8; Ex. 5 to Doc. 11.] This automobile was covered against loss due to theft pursuant to the physical-damage provisions of an insurance policy issued by Defendant on April 24, 2004.[1]   These provisions state that Defendant "will pay for each loss, less the applicable deductible, caused by other than collision, to the owned or non-owned auto." [Policy at 8.] The physical-damage provisions of the policy limit Defendants' liability for such a loss to "the actual cash value of the property at the time of the loss," which "will not exceed the cost to repair or replace the property, or any of its parts." [Policy at 9.]  The declarations page of the policy lists a $1,000 deductible for this coverage.  [Policy at declarations page.]

The policy states that it does not cover "loss for custom parts or equipment unless the existence of those custom parts or equipment has been previously reported to us and an endorsement to the policy has been added."  [Policy, New Mexico Amendment at 2.]

---

[1]The insurance policy at issue in this case appears in the record as Exhibit 6 to Defendant's exhibits in support of its motion for summary judgment [Doc. 237], and, with the addition of the declarations page, as Exhibit A to Plaintiffs' motion for partial summary judgment [Doc. 8.  For ease of reference, it will be cited simply as the "Policy" in this *Memorandum Opinion and Order.*

Plaintiffs' policy does not contain such an endorsement, nor does it contain or refer to an insurance application or other document reporting the existence of any custom parts or equipment.  [Doc. 237, Ex. 6; Doc. 8, Ex. A.]

The policy provides that the following conditions apply to the physical damage coverage noted above.  First, "[a]s soon as possible after the loss, written notice must be given by or on behalf of the insured to us or our authorized agent stating: (a) the identity of the insured; (b) a description of the auto or trailer; (c) the time, place and details of the loss; and (d) the names and addresses of any witnesses."  Second, "[i]n case of theft, the insured must promptly notify the police."  Third, the policy requires the insured to "cooperate and assist" the insurer, if requested, "in the investigation of the loss," "in securing and giving evidence," and "by obtaining the attendance of witnesses."  [Policy, at 9.]

In addition, the general conditions at the end of the policy state that:  "The *insured* or any other person seeking coverage under this policy must submit to examination under oath by any other person named by us when and as often as we may require."   Further, "[c]overage is not provided to any person who knowingly conceals or misrepresents any material fact or circumstance relating to this insurance . . . at the time the application is made," or "at any time during the policy period," or "in connection with the presentation or settlement of a claim."  [Policy, at 15.]

The evidence of Plaintiffs' compliance with these conditions is as follows.  On the afternoon of May 13, 2004, an adjuster for Defendant named Robin Stevenson conducted a recorded interview of Plaintiff David Stephens.  During that interview, Mr. Stephens

identified himself, stated that he had been living in Gallup, New Mexico since December 1, 2003, and that he was employed by "On Sat and Network Communications" as an "Installations Manager."  [Doc. 237, Ex. B to Stevenson Aff.]

Mr. Stephens also provided a description of the 1994 Toyota Supra automobile that he was reporting as stolen.  He stated that the car was a turbo-charged "GT model" with a six-speed transmission and approximately 66,650 miles on it that he purchased for $31,000 about three weeks earlier from a friend named Christopher Chase.  Mr. Stephens explained how he paid for the car as follows:  "I paid with my own money[;] I had fifteen thousand I took out of an account in Texas and then another [sixteen] thousand just out of personal money I have."  Ms. Stevenson responded that:  "I will need proof of that," to which Mr. Stephens replied, "O.K.  That's fine."  [Doc. 237, Ex. B to Stevenson Aff.]

As further justification for the price of the car, Mr. Stephens told Ms. Stevenson that:  "It's a very rare car.  They don't make them anymore."  He also stated that:  "I have the upgrades that were done to the car over twenty thousand and I do have receipts for that too."  Ms. Stevenson then asked whether Mr. Stephens had informed Defendant of "all this work" when he got coverage, and Mr. Stephens answered, "No, I didn't."  [Doc. 237, Ex. B to Stevenson Aff.]

During the interview, Mr. Stephens also provided the following information about the time, place, and details of the loss.  According to Mr. Stephens, the last time he saw the car was on Saturday, May 8, 2004, between 8:30 and 9:00 p.m., when the car was parked in a parking lot west of the Marriott Hotel near the intersection of Louisiana Boulevard and

Interstate 40 in Albuquerque, New Mexico. Mr. Stephens drove from Gallup to Albuquerque that day to visit some friends and "take care of some personal stuff." According to Mr. Stephens, he arrived in Albuquerque "around noon" and went to a car shop named "Dyno Edge," to see if they could check his car to see "how much horsepower it has." He did not have an appointment at the car shop, however, and they were unable to fit him in that day. After his visit to the car shop, Mr. Stephens stated that he went to the home of his friend, Mr. Chase, from whom he had purchased the car a few weeks earlier. [Doc. 237, Ex. B to Stevenson Aff.]

Mr. Stephens explained that his wife, Plaintiff Stacey Stephens, recently had a baby, and that she drove in a separate vehicle from Gallup to Albuquerque with the baby later that day and met up with him at Mr. Chase's house around 5 p.m. After he and his wife visited at the Chase residence for about an hour and a half, they went to dinner at "Rudy's B.B.Q." in Albuquerque. After dinner, Mr. Stephens and his wife drove their separate vehicles to the parking lot of the Marriott Hotel, where they had planned to check in and spend the night. [Doc. 237, Ex. B to Stevenson Aff.]

Upon arriving at the parking lot, however, Mr. Stephens explained that his wife changed her mind about staying the night at the hotel and instead wanted to drive back to Gallup because "she realized she'd forgotten a few things that the baby would need," namely "baby wipes" and some over-the-counter "liquid tylenol for babies," both of which they "probably could of bought . . . at a store." Mr. Stephens offered no explanation of why Plaintiffs did not simply purchase the necessary items at a local store instead of driving all

the way back to Gallup, nor did he explain why they did not park the car at the home of their friend, Mr. Chase, instead of leaving it in the hotel parking lot for several days.  [Doc. 237, Ex. B to Stevenson Aff.]

In any event, Mr. Stephens stated that after his wife changed her mind about staying at the hotel, the couple drove back to Gallup with the baby in her car, leaving the 1994 Toyota Supra parked in the parking lot of the Marriott Hotel for several days.  He did not tell anyone at the Marriott Hotel that he was leaving his car in the hotel parking lot during that period.  He stated that his plan was to return to Albuquerque the following Wednesday to pick up his mother-in-law from the airport, and that he was going to retrieve the 1994 Toyota Supra from the Marriott parking lot during that trip.  According to Mr. Stephens, he returned to the Marriott parking lot with his mother-in-law as planned on May 12, 2004, only to discover that the car was missing.  He contacted hotel security to find out if the car had been towed.  After being informed that it had not, he contacted the police and then notified Defendant of the loss.  [Doc. 237, Ex. B to Stevenson Dep.]

After obtaining this information from Mr. Stephens, Ms. Stevenson explained Defendant's claims process to him as follows:

> I will be sending out a theft questioneer [sic] that needs to be filled out along with a[n] affidavit of total loss that needs to be filled out completely and notarized. . . .  I will request a copy of the police report also our special investigating unit will be in touch with you[;] they will give a face to face interview with you, your wife, Ms. Chase, and your mother-in-law. . . .  And once we get all our information in and review everything then I will be in touch with you to let you know [inaudible] . . . .  Now this will be filed under your comprehensive coverage[;] under that coverage you have a thousand

dollars deductible that will apply[;] you will be responsible for the first thousand and GEICO pays anything after that . . . .

[Doc. 237, Ex. B to Stevenson Aff.]  Ms. Stevenson then sent Plaintiff Stacey Stephens a letter dated May 13, 2004, attaching the forms referenced in the portion of the interview quoted above.  Ms. Stevenson's letter also requested that in addition to completing these forms, Plaintiffs should include "a copy of the bill of sale or front and back of your title," "[r]ecent receipts for any upgrades or add ons to your auto," and a "copy of the police report."  [Doc. 237, Ex. C to Stevenson Aff.]

In his subsequent deposition testimony, Mr. Stephens admitted receiving Ms. Stevenson's letter of May 13, 2005.  He estimated that it took him "about two months" to compile information in response to her letter and send it to her.  [Doc. 237, David Stephens Dep. at 86-87.]  According to the date stamp imprinted on the completed questionnaire and affidavit, it appears that Defendant received these documents from Plaintiffs on or about June 11, 2005.  [Doc. 189, Ex. CC, DD; Stevenson Dep. at 94-95.]  There remained other issues, such as determining whether the car had a salvage title, that were not resolved until after the date stamped on the theft questionnaire.  [Doc. 11, Ex. 2, at 79-80; Ex. 6.]

On July 7, 2004, Ms. Stevenson ran a "CCC Valuescope Claims Services Market Report," which gave a local market value of $17,000 for Plaintiffs' 1994 Toyota Supra.  After subtracting the $1,000 deductible indicated on the declarations page for Plaintiffs' policy and adding taxes and title fees, Ms. Stevenson calculated $16,535 as the amount payable to Plaintiffs under their policy.  [Doc. 237, Stevenson Aff. ¶ 7, Ex. D.]  On July 8,

2004, Ms. Stevenson offered Mr. Stephens this amount to settle Plaintiffs' claim, and he declined her offer.  [Doc. 237, David Stephens Dep. at 92, Stevenson Dep. at 34; Doc. 202, Stevenson Dep. at 100; Doc. 205.]

Ms. Stevenson's initial offer was based on the value of a 1994 Toyota Supra with unknown mileage.  [Doc. 237, Ex. D to Stevenson Aff.; Stevenson Dep. at 35.]  After further discussion with Mr. Stephens about the car's mileage, Ms. Stevenson ran another "CCC Valuescope Claims Services Market Report" reflecting mileage of 68,000, which gave a local market value of $20,831.  [Doc. 237, Stevenson Aff. ¶ 8, Ex. E; Stevenson Dep. at 36; David Stephens Dep. at 92-93.]  After subtracting the $1,000 deductible and adding tax and title fees, Ms. Stevenson made a second offer in the amount of $20,480.93 on July 13, 2004.  [Doc. 237, Stephenson Aff. ¶ 8, Ex. E; Stevenson Dep. at 36.]  Mr. Stephens did not accept the second offer.  [Doc. 237, Stevenson Dep. at 37; David Stephens Dep. at 93.]

The discussions between Mr. Stephens and Ms. Stevenson then turned to whether there was any more concrete information in the file which could support a higher valuation, and Mr. Stephens referred Ms. Stevenson to the receipts for the after-market parts that had been added to the car.  [Doc. 237, Stevenson Dep. at 37.]  Upon reviewing the receipts which Defendant had gathered as of July 15, 2004, however, Ms. Stevenson noted that there was a discrepancy:  some of the receipts were dated during a period when the car was reported stolen by the previous owner, Mr. Chase.  [Doc. 237, Stevenson Dep. at 37; Stevenson Aff. ¶¶ 9, 10, Ex. G, H; Doc. 205, Stevenson Dep. at 14-15.]  The fact that the car had been

reported stolen by Mr. Chase was documented on an "ISO Report" that Ms. Stevenson printed on July 15, 2004.  [Doc. 237, Stevenson Aff. ¶ 9, Ex. G.]

After noting this discrepancy between the receipts and the ISO report, Ms. Stevenson wrote a letter to Plaintiffs dated July 15, 2004, in which she stated that she was retracting the previous settlement offers in order to further investigate the theft.  [Doc. 237, Stevenson Aff. ¶ 11, Ex. I.]  Plaintiffs received this letter.  [Doc. 237, David Stephens Dep. at 93.]

Defendant's next significant step in the investigation of Plaintiffs' theft claim was to attempt to schedule an examination under oath (EUO).  This attempt was undertaken by Attorney David Rosales, whom Defendant had retained for this purpose.  [Doc. 237, Rosales Aff. ¶ 2.]  Mr. Rosales sent a letter to Plaintiffs dated July 30, 2004, confirming that he had scheduled an examination under oath with them for August 16, 2004.  Mr. Rosales' letter of July 30, 2004, also contained an extensive list of documents and other items (such as the keys to the vehicle) that he asked Plaintiffs to bring to their examination.  In addition, the letter encouraged Plaintiffs to bring "any other documents which you feel are relevant or important to your claim," noting that: "An examination under oath is your opportunity to put your best foot forward in presenting your claim to the insurance company."  Plaintiffs also were advised that they could, at their own expense, have counsel present with them at the examination under oath.  [Doc. 237, Rosales Aff. ¶ 4; Ex. B.]

Plaintiff David Stephens received Mr. Rosales' letter and appeared at the examination under oath on August 16, 2004.  Mr. Stephens did not bring any documents with him, and he also forgot to bring the keys for the vehicle.  [Doc. 237, Ex. 3, at 10, David Stephens Dep.

-9-

at 108-09; Doc. 11, Ex. 1, at 11-1.]   He did, however, answer some questions at the examination under oath on that date.   For example, he explained that he owned several vehicles and was making payments on loans with outstanding balances totaling about $75,000.  He was behind on some of these payments in the last year.  [Doc. 11, Ex. 1, at 35-37; see also Doc. 237, Stacey Stephens Dep. at 13.]

Although Mr. Stephens stated that he was standing by the representations he made to Ms. Stevenson in the recorded interview on May 13, 2005 [Doc. 237, Ex. 3, at 39], some of Mr. Stephens answers at the examination under oath on August 16, 2004, were not consistent with information he previously provided.   For example, he admitted that he had been collecting unemployment insurance from June to December 2003, even though his auto insurance application dated September 12, 2003, stated that he was employed as an "installations manager" during that period.   [Doc. 237, Ex. 3, at 9; Ex. 1A to Garay Aff; David Stephens Dep. at 23.]

In addition, Mr. Stephens admitted that he had no bank accounts in Texas in the past three years, even though his previous recorded statement to Ms. Stevenson was that $15,000 of the money he had paid for the car in April 2004 he "took out of an account in Texas." [Doc. 237, Ex. 3, at 29-30; Ex. B to Stevenson Aff; David Stephens Dep. at 22-23, 29, 40.] Moreover, Mr. Stephens contradicted his earlier statement that he had paid for the car himself, as indicated in the recorded interview on May 13, 2004.  Instead, he admitted at the examination under oath on August 16, 2004, that his brother, Jay Stephens, invested in the car with him by paying $15,000 of the purchase price.  [Doc. 11, Ex. 1, at 24-25.]  Mr.

Stephens further explained that he kept relatively large amounts of cash on hand because he was in the process of buying and selling various automobiles.  [Doc. 11, Ex. 1, at 25-26, 35-38.]

Because Plaintiffs did not bring any documents or car keys to the examination under oath on August 16, 2004, Mr. Rosales decided to continue that examination until another date.  [Doc. 237, Ex. 3, at 39-42.]  Mr. Rosales then wrote another letter to Plaintiffs dated August 30, 2004, in which he reiterated his requests for the documents and other items listed in his previous letter of July 30, 2004, and repeated much of the advice contained in that previous letter.  [Doc. 237, Rosales Aff. ¶ 5, Ex. C.]

On September 14, 2004, while Mr. Rosales' requests were still pending, Plaintiffs David Stephens and Stacey Stephens filed a civil action in state court asserting claims against Defendant for violation of New Mexico's Unfair Claims Settlement Practices Act (UCSPA), breach of an implied covenant of good faith and fair dealing, and breach of contract.[2]  [Doc. 1.]  Plaintiffs' counsel also sent a letter to Mr. Rosales on that date advising him that Plaintiffs were represented by counsel.  [Doc. 237, Rosales Aff. ¶ 6, Ex. D.]  Further correspondence ensued between the attorneys regarding the rescheduling of Plaintiff David Stephens' examination under oath and the production of the documents that Mr. Rosales had previously requested.  [Doc. 237, Rosales Aff. ¶ 7, Ex. E, F, G; Doc. 189, Ex. HH.]

---

[2]Defendant later removed the action to the United States District Court for the District of New Mexico on October 14, 2004.  [Doc. 1.]

In this correspondence, Plaintiffs' counsel also requested a certified copy of the insurance policy. [Doc. 189, Ex. HH.]  Mr. Rosales acknowledged receipt of this request on September 20, 2004, and sent what he believed to be a certified copy of the correct policy on September 28, 2004. [Doc. 205, Rosales Aff. ¶¶ 6, 7; Ex. C, D.]  It turned out that this policy contained an incorrect cover page listing another of Defendant's insureds instead of Plaintiffs.  Plaintiffs' counsel first informed Mr. Rosales of this fact and renewed his request for a copy of the correct policy in a letter dated November 1, 2004. [Doc. 205, Rosales Aff. ¶ 8; Ex. E.]

Eventually, the examination under oath was rescheduled for November 3, 2004, and Plaintiffs provided Defendant with the car keys and some of the other documents previously requested in Mr. Rosales' letters on that date. [Rosales Aff. ¶¶ 10-11, Ex. H, I; Doc. 11, Ex. 2, at 49-54.]  Although Plaintiffs did not produce any documentation to account for $16,000 of the $31,000 purchase price for the car, Mr. Stephens explained to Mr. Rosales how he came up with that amount to purchase the car from Mr. Chase, and he listed in greater detail the aftermarket parts that were installed on the vehicle.  [Doc. 11, Ex. 2, at 60-61, 73-74.]  Mr. Stephens also discussed a conversation he had with the previous owner of the vehicle, Mr. Chase, in which Mr. Chase had acknowledged reporting the vehicle as stolen during the time that Mr. Chase owned it.  Mr. Stephens estimated that this conversation with Mr. Chase occurred around the time that he was attempting to resolve the question whether the car had a salvage title.  [Doc. 11, Ex. 2, at 80-82.]

The documents turned over to Mr. Rosales as a result of the examination under oath revealed additional information about Plaintiffs' financial condition at the time the theft was reported. Their bank statement for the period ending May 13, 2004, had overdrafts. [Doc. 237, Rosales Aff. ¶ 3, Ex. A.] Ms. Stephens had a tax lien filed against her that she was paying at the time the auto theft claim was submitted to Defendant. [Doc. 237, Stacey Stephens Dep. at 13-14.]

After the examination under oath concluded, Mr. Rosales obtained the correct, certified original of Plaintiffs' insurance policy and sent it to Plaintiffs' counsel in a letter dated November 17, 2004, which also addressed a number of other concerns that Plaintiffs' counsel had raised about the examination under oath. [Doc. 205, Rosales Aff. ¶ 10; Ex. F; Doc. 189, Ex. II.] Then, in a letter dated December 20, 2004, Mr. Rosales conveyed an offer to Plaintiffs' counsel under which Defendant would agree to settle Plaintiffs' auto theft claim for $31,000, an amount equivalent to what Mr. Stephens had claimed he paid for the vehicle when he purchased it from Mr. Chase. [Doc. 205, Rosales Aff. ¶ 11; Doc. 11, Ex. 4.]

At the time Mr. Rosales conveyed this offer, *Plaintiffs' Motion for Partial Summary Judgment* [Doc. 8] was pending in this Court.[3] In their reply brief regarding that motion, which was filed on January 7, 2005, Plaintiffs asserted that the settlement offer conveyed by Mr. Rosales on December 20, 2004, constituted an admission of Defendant's liability, and

_____

[3]The Court subsequently denied Plaintiffs' motion in the *Memorandum Opinion and Order* [Doc. No. 101] filed on May 20, 2005. At the time of that ruling, the payment of the $31,000 and counsels' January 2005 letters concerning that payment were not part of the record presented to the Court.

that Defendant had breached the insurance contract because Defendant had not yet paid the claim despite this admission.  [Doc. 12.]

Plaintiffs' reply brief did not inform the Court, however, that Plaintiffs' counsel had written a letter to Mr. Rosales three days earlier on January 4, 2005, stating that Plaintiffs "agree that $31,000 represents the fair market value at the time of the loss for their 1994 Toyota Supra."  [Doc. 237, Rosales Aff. ¶ 13, Ex. K.]  In a subsequent letter to Mr. Rosales dated January 10, 2005, Plaintiffs' counsel clarified that:  "My clients do not consider the amount of $31,000 to be a 'compromised settlement' of their claim with GEICO."  Instead Plaintiffs only agreed that "the amount represents *the fair market value of the vehicle at the time of the loss*.  What GEICO chooses to do with that information is up to GEICO and GEICO alone."  [Doc. 189, Ex. GG.]

Defendant subsequently issued a check to Plaintiffs' counsel in the amount of $31,000 on January 20, 2005.  [Doc. 189, Ex. FF.]  As indicated in their counsel's letter of January 10, 2005, Plaintiffs did not agree to dismiss their lawsuit in exchange for this payment. Instead, they elected to pursue additional compensatory damages in the amount of $11,127.70, which represented Plaintiffs' attorney fees and costs, plus $750,000 in punitive damages.  [Doc. 237, Ex. 15, at 12-13.]

A series of discovery disputes then ensued.  Eventually, depositions were taken of Plaintiffs, the parties' experts, and a number of Defendant's employees involved in the auto-theft investigation and claims-handling process.  For the most part, the testimony gleaned from these depositions simply confirmed or added detail to the chronology of events

described above.  There were, however, some additional facts that appear in the record for the first time in the excerpts of deposition transcripts and affidavits attached to the parties' dispositive motions filed in August 2005.

Both parties' experts agreed with the basic proposition that the National Insurance Crime Bureau (NICB) is regarded in the insurance industry as a reliable source of information concerning procedures for investigating insurance fraud.  [Doc. 237, Partlow Dep. at 92-96; Zalma Aff. ¶ 3.]  The NICB has published a bulletin entitled "Indicators of Vehicle Theft Fraud," which lists a number of "red flags" which indicate possible fraud and merit closer scrutiny of an auto theft claim.  [Doc. 237, Zalma Aff. ¶ 3, Ex. A.]   This list includes the following "red flags," at least some of which were present during the initial reporting and investigation of Plaintiffs' auto theft claim from May 2004 to July 2004:

> [Insured] [h]as lived at current address less than six months.
> . . .
>
> [The vehicle] [w]as purchased for cash with no bill of sale or proof of ownership.
>
> Recently purchased new/old model with no lien holder.
> . . .
>
> Is customized, classic and/or antique.
> . . .
>
> Purchase price was exceptionally high or low.
> . . .
>
> Has theft and/or salvage history.
> . . .
>
> Is older model with exceptionally low mileage, i.e., odometer rollover or roll-back.

Is older or inexpensive model and insured indicates it was equipped with expensive accessories which cannot be substantiated with receipts.

. . .

Loss occurs within one month of issue or expiration of policy.

[Doc. 237, Zalma Aff. ¶¶ 3-4, Ex. A; Ex. B, G to Stevenson Dep.]

After withdrawing its initial offers and further investigating the claim from July 2004 until the $31,000 offer was made in December 2004, the following additional "red flags" listed on the NICB bulletin became apparent:

Have recent or current marital and/or financial problems.

. . .

Income not compatible with value of insured vehicle.

. . .

Is behind in loan payments on vehicle and/or financial obligations.

[Doc. 237, Zalma Aff. ¶¶ 3-4; Ex. A; Partlow Dep. at 97-113.]  An insured's cancellation or delay in providing statements and/or examinations under oath is also a "red flag" indicator according to the NICB bulletin.  [Doc. 237, Zalma Aff. ¶¶ 3-4, Ex. A.]  This "red flag" may have applied during the period between the initial examination under oath on August 16, 2004, and its rescheduling on November 3, 2004, as well as the period attributable to Plaintiffs' delays in completing their depositions during this litigation. [Doc. 70, 71, 90, 105, 129, 137. ]

When his deposition was finally taken on July 25, 2005, Mr. Stephens admitted that he has a prior felony conviction arising from his burglary of several automobiles on May 10, 1993.  His criminal history also includes a probation violation and a guilty plea to a federal

conspiracy charge relating to a series of events that occurred while Mr. Stephens was working at a car dealership.  According to Mr. Stephens' guilty plea, he conspired with a group of car thieves by providing them with the keys and paper licenses to new vehicles at the car dealership, and then his co-conspirators used the keys and licenses to steal the vehicles from the dealership and transport them across state lines.  [David Stephens Dep. at 129-37.]

With its summary judgment motion, Defendant included a copy of a judgment from a Texas state court which was referenced at Mr. Stephens' deposition and which further documents his criminal history.  [Doc. 237, Ex. 16.]  This public record regarding Mr. Stephens' criminal history predates the auto theft claim at issue in this litigation.

At his deposition on July 25, 2005, Mr. Stephens gave an additional or alternative reason why he and his spouse allegedly decided to leave the 1994 Toyota Supra in the hotel parking lot and drive back to Gallup instead of spending the night in Albuquerque. According to Mr. Stephens, a review of the cell phone records that he provided to Mr. Rosales refreshed his recollection that the bishop from his church in Gallup had called while he was having dinner in Albuquerque at 7:47 p.m. on the evening of May 8, 2004, and reminded him that he needed to supply the church with flowers the following day, which was Mother's Day.  This call allegedly prompted Mr. Stephens to return to Gallup that evening. [Doc. 205, David Stephens Dep. at 74-77, with attached telephone record.]

But according to the telephone records and the deposition testimony of Mr. Stephens' spouse, Stacey Stephens, it was she who called Mr. Stephens on his cell phone at 7:47 p.m.

that evening when the couple was allegedly eating dinner together.  [Doc. 205, Stacey Stephens Dep. at 26-27, and attached telephone record.]  To explain this discrepancy, Ms. Stephens stated that she had "probably" called Mr. Stephens when the couple first arrived at the restaurant and that "I just wanted to know where he was going to park."  [Doc. 205, Stacey Stephens Dep. at 27.]

Stacey Stephens' mother, Joanne Lucas, was deposed on July 15, 2005, in order to determine whether she could corroborate Mr. Stephens' story that he first discovered the 1994 Toyota Supra after picking her up from the airport on May 12, 2004.  At her deposition, Ms. Lucas could not recall anything about going to the Marriott Hotel in Albuquerque that morning, nor could she recall any conversations or events relating to the 1994 Toyota Supra on that date.  [Doc. 237, Lucas Dep. at 23-24.]

Mr. Stephens' telephone records for May 12, 2004, show that he first called the Albuquerque Police Department at 9:30 a.m. that morning.  [Doc. 237, Rosales Aff. ¶ , Ex. M; Leal Aff., Ex. 9.]  The timing of this call is not consistent with Plaintiffs' deposition testimony, which states that Mr. Stephens was picking up Ms. Lucas from the Albuquerque airport at roughly 9:30 a.m. that morning, and that his first call to the Albuquerque police did not occur until a number of other events transpired, including taking Ms. Lucas to a book store, filling the car he was driving with gas, looking for the 1994 Toyota Supra in the hotel parking lot, and conversing with hotel staff.  [Doc. 237, David Stephens Dep. at 61-65; Stacey Stephens Dep. at 63-64.]

As of the date briefing was completed on the parties' summary judgment motions [Doc. 222, 224], Defendant had not yet deposed Christopher Chase, the person who allegedly sold the 1994 Toyota Supra to Mr. Stephens and with whom Mr. Stephens allegedly conversed about the theft of this vehicle and the details of his insurance claim. Mr. Chase's deposition apparently has been delayed because he is represented by counsel in other pending litigation. [Doc. 227, 232, 240.]

Specifically, state court records reflect that Mr. Chase is charged in a 32-count indictment with sexually assaulting several women while employed as an Albuquerque police officer, as well as tampering with evidence. See State v. Chase, No. D-202-CR-200301990 (N.M. 2d Jud. Dist. Ct. indictment filed June 27, 2003). In addition, Mr. Chase is a defendant in several civil actions in federal court in which he is accused of violating the civil rights of Albuquerque citizens during his former employment as a police officer. See Seeley v. Chase, No. CIV 04-0118 JC/LFG (D.N.M. Feb. 16, 2005) ($943,380.00 judgment in favor of a citizen whom Mr. Chase sexually assaulted in the back of his police car); Edwell v. Chase, No. CIV 05-0019 MV/WDS (D.N.M. complaint filed Jan. 10, 2005); Ham v. Chase, No. CIV 05-0034 JB/RHS (D.N.M. complaint filed Jan. 12, 2005); Gallegos v. Chase, No. CIV 05-0043 BB/RHS (D.N.M. complaint filed Jan. 13, 2005). The relevance, if any, of the pending charges filed against Mr. Chase in 2003 and the termination of his employment as an Albuquerque police officer has yet to be explored and is not considered in this *Memorandum Opinion and Order*.

II.   <u>ANALYSIS</u>

    A.   <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-52 (1986).  A fact is "material" if it might affect the outcome of the case.  <u>See id.</u> at 248.

When the movant is also the party bearing the burden of persuasion on the claim for which he or she is seeking summary judgment, the movant must show that the record as a whole satisfies each essential element of his or her case and negates any affirmative defenses in such a way that no rational trier of fact could find for the non-moving party.  <u>See 19 Solid Waste Dep't Mechanics v. City of Albuquerque</u>, 156 F.3d 1068, 1071 (10th Cir.  1998); <u>Newell v. Oxford Mgmt., Inc.</u>, 912 F.2d 793, 795 (5th Cir. 1990); <u>United Missouri Bank of Kansas City, N.A. v. Gagel</u>, 815 F. Supp. 387, 391 (D. Kan. 1993).  But when the movant does not bear the burden of proof as to the claim or defense at issue in the motion, then judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'"  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).  In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue."   Burns v. Bd. of County Comm'rs., 330 F.3d 1275, 1282 (10th Cir. 2003);  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1223 n.2 (10th Cir. 2000); Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).

In this case, the parties have submitted exhibits and deposition testimony that contain hearsay and hearsay within hearsay.  In reviewing these materials to determine whether a party is entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed.  See Fed. R. Evid. 801(d)(2); Pastran v. K-Mart Corp., 210 F.3d 1201,

1203 n.1 (10th Cir. 2000).  The Court does, however, consider statements attributed to third parties for other admissible purposes.  In particular, such statements may be considered for the limited purpose of showing their effect on the listener or the declarant's state of mind. See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind); Pastran, 210 F.3d at 1203 n.1 (similar).  They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements.  See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001).

Apart from such limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

Both parties have filed summary-judgment motions in this case.  Plaintiffs seek partial summary judgment or, in the alternative, judgment on the pleadings with respect to Defendant's affirmative defenses.  [Doc. 189.]  As previously noted in the *Memorandum Opinion and Order* [Doc. 101] filed on May 20, 2005, it is generally an affirmative defense under New Mexico law for an insurer to assert that it is entitled to deny an insurance claim

in its entirety and refuse to pay any amount to the insured for a known loss on the grounds that the insured has failed to comply with the terms and conditions of the insurance policy. See, e.g., Foundation Reserve Ins. Co. v. Esquibel, 94 N.M. 132, 134, 607 P.2d 1150, 1152 (1980); Green v. General Accident Ins. Co. of Am., 106 N.M. 523, 525, 746 P.2d 152, 154 (1987).  In other words, if Defendant wishes to invoke the general conditions of the policy which allow them to completely deny coverage based on fraud or misrepresentation by the insured [Policy, at 15], then Defendant bears the burden of proving that such conditions apply.

Under the current procedural posture of this case, however, it is unnecessary for the Court to determine in the first instance whether Defendant properly raised such affirmative defenses in its pleadings, or whether such affirmative defenses are sufficient to survive Plaintiffs' motion for summary judgment or, in the alternative, judgment on the pleadings. The parties do not dispute that on January 20, 2005, Defendant tendered a payment to Plaintiffs' counsel in the amount of $31,000, and Plaintiffs' have admitted that this amount is equal to the fair market value of the 1994 Toyota Supra that is the subject of their auto theft claim.  Thus, Defendant is not in the position of denying the claim in its entirety based on the type of affirmative defense noted above.  Rather, the question is whether Plaintiffs are entitled to additional damages above and beyond the $31,000 already paid.

In order to withstand Defendant's motion for summary judgment, it is Plaintiffs' burden to present admissible evidence which would support a reasonable inference that they suffered such additional damages as a result of Defendant's bad faith, violation of New

Mexico insurance law, breach of the insurance contract, or breach of an implied covenant of good faith and fair dealing.  I conclude that Plaintiffs have not done so for the reasons set forth below.

**B.**     **Plaintiffs' Contract Claim**

New Mexico courts recognize the general principle that "the plaintiff in a contract action must prove his or her damages by a preponderance of the evidence in order to be entitled to compensation for them."  Servants of the Paraclete, Inc. v. Great Am. Ins. Co., 866 F. Supp. 1560,  1578 (D.N.M. 1994) (citing Mitchell v. Lovato, 97 N.M. 425, 427, 640 P.2d 925, 927 (1982), and Stevens v. Mitchell, 51 N.M. 411, 414, 186 P.2d 386, 389 (1947)).  "The rule appears to be no different for insurance contracts than for other types of contracts."  Id. at 1578-79 (citing and quoting 19  Ronald A. Anderson & Mark S. Rhodes, Couch Cyclopedia of Ins. Law § 79:367,  at 318 (1983)).

The limit of Defendant's liability on the policy at issue here "is the actual cash value of the property at the time of the loss."  [Policy at 9.]  Thus, for purposes of their breach-of-contract claim, Plaintiffs bear the burden of proving the actual cash value of the stolen automobile at the time of the loss.  Because Plaintiffs admit the $31,000 payment that Defendant tendered on January 20, 2005, is equal to the actual cash value of the property at the time of the loss, Defendant already has paid an amount equal to the limit of its liability on the policy.  Therefore, Plaintiffs cannot meet their burden of proving damages for

purposes of their contract claim, and Defendant is entitled to summary judgment on this claim.[4]

### C.      Plaintiffs' Bad-Faith Claim

Defendant's $31,000 payment to Plaintiffs does not end the matter because Plaintiffs did not agree to dismiss this lawsuit in exchange for this payment, and New Mexico courts have recognized that an insurer's claims-handling procedures may be undertaken in bad faith or in violation of statutory requirements even when the insurer does not breach the contract by refusing to pay the full amount requested by the insured.  See O'Neel v. USAA Ins. Co., 2002-NMCA-028, ¶¶ 7-11, 131 N.M. 630, 41 P.3d 356.  In this regard, Plaintiffs contend that even if their auto theft claim was not denied in violation of the terms of the insurance policy, Defendant caused an unreasonable delay in their receipt of the $31,000 payment to which they were entitled under the policy.

To support this contention, Plaintiffs allege that Defendant engaged in delay tactics such as "lowballing" Plaintiffs in negotiating settlement of their claim, relying on fabricated data to determine the value of Plaintiffs' stolen vehicle, making unreasonable demands on Plaintiffs, and changing the company's position on the claim without justification.  Plaintiffs

---

[4]I note that the $31,000 payment does not account for the $1,000 deductible provided in the policy, nor does it reflect whether there are any taxes or title fees to be added or subtracted. As Plaintiffs have not presented admissible evidence that these factors would result in a net payment greater than the $31,000 already paid, Defendant is entitled to summary judgment on this claim.

further allege that this unnecessary delay breached the implied covenant of good faith and fair dealing inherent in every insurance contract.

In response to these allegations, Defendant asserts that it was justified in delaying payment during the investigation of Plaintiffs' claim, and that its timely performance of the contract was frustrated by Plaintiffs' failure to cooperate.  To support this assertion, Defendant cites the general principle of New Mexico law that a party to a contract cannot recover damages if that party's own act or failure to act prevented the other party from performing its obligations under the contract.  See Gibbs v. Whelan, 56 N.M. 38, 41-42, 239 P.2d 727, 730 (1952); UJI 13-841 NMRA 2005.  Defendant also cites the principle that: "The obligation to deal fairly and honestly rests equally upon the insurer and the insured." Am. Employers Ins. Co. v. Crawford, 87 N.M. 375, 379, 533 P.2d 1203, 1207 (1975).

In accordance with these general principles, New Mexico courts have held that notice and filing of proof of loss with the insurer is generally a condition precedent to an insurer's liability under a contract.  See Zengerle v. Commonwealth Ins. Co., 63 N.M. 454, 455, 321 P.2d 636, 637 (1958).  While such requirements can be waived, the insured bears the burden of proving a valid waiver.  See id. at 455-56, 321 P.2d at 637

Plaintiffs attempt to counter this argument by citing the proposition that an insurer cannot rely on limitations or exclusions in an insurance policy as a basis for denying coverage or liability when the insurer has not provided the insured with a copy of the policy (or some other document that provides equivalent notice of the limit or exclusion at issue). While Plaintiffs cite authority from other states to support this proposition, there are reported

-26-

opinions from New Mexico courts suggesting that it applies in this state as well under principles of waiver and estoppel.  See, e.g.,  Homestead Investments, Inc. v. Foundations Reserve Ins. Co., 83 N.M. 242, 245, 490 P.2d 959, 962 (1971); Willey v. United Mercantile Life Ins. Co., 1999-NMCA-137, ¶¶ 18-19, 128 N.M. 98, 990 P.2d 211.  But cf. Young v. Seven Bar Flying Serv., Inc., 101 N.M. 545, 548, 685 P.2d 953, 956 (1984) (noting that "failure of an insurer to provide an individual with a copy of an applicable insurance policy will not, in every case, release the individual from the [limitations or exclusions] . . . in the policy").

These authorities are unavailing under the current posture of this case, however, because Defendant has not denied Plaintiffs' claim on the basis of an undisclosed limitation or exclusion in the policy.  Rather, Defendant paid Plaintiffs' claim for the vehicle's asserted value of $31,000, and the remaining question is whether the delay in Plaintiffs' receipt of this payment was caused by a lack of good-faith on the part of Defendant.  In other words, even if Defendant ultimately did not deny coverage based on the assertion that Plaintiffs failed to cooperate or engaged in fraud or misrepresentation, was it unreasonable for Defendant to delay payment on the claim while awaiting the results of its investigation or further cooperation from Plaintiffs?

To answer this question, Plaintiffs do not cite a specific statutory or contractual time limit for investigating and paying an auto theft claim in New Mexico that would provide a date certain on which the claim should have been paid, nor do they cite to any authority establishing the permissible scope of the information an insurer may request when

investigating or evaluating such a claim.  Rather, they appear to rely on the general standard of unreasonableness that New Mexico courts apply in insurance bad-faith cases.  See Sloan v. State Farm Mut. Auto. Ins. Co., 2004-NMSC-004, ¶¶ 18-19, 135 N.M. 106, 85 P.3d 230 (recognizing a cause of action for insurance bad faith where a delay in payment is caused by unreasonable behavior on the part of the insurer).

To prove that Defendant's delay in paying their claim was unreasonable in this case, Plaintiffs rely in part on deposition testimony from Defendant's adjusters to the effect that thirty days is generally considered a reasonable period of time for settling a normal, total-loss theft claim.  [Doc. 202, Stevenson Dep. at 105, Shook Dep. at 23.]  This deposition testimony does not create a genuine issue of material fact concerning the unreasonableness of the delay because it is taken out of context.  When Defendant's adjusters estimated that 30 days would be considered a reasonable amount of time to settle a claim, they were not referring to Plaintiffs' claim.  Rather, they qualified their answers by stating that the amount of time would depend on whether they were presented with a "normal claim," [Doc. 202, Stevenson Dep. at 105], *i.e.*, "an auto theft claim in general" where "everything comes back and everything looks clean and everything looks pretty clear." [Doc. 202, Shook Dep. at 23.]

The evidence of record does not provide any reasonable basis to support the conclusion that Plaintiffs' claim was a normal claim in which everything comes back and everything looks clean and clear.  Rather, the only reasonable conclusion that can be drawn from this evidence is that there were several discrepancies or difficulties with Plaintiffs' claim that warranted further investigation and evaluation.  To begin with, Mr. Stephens

admitted in his deposition testimony that it took him "about two months" to compile and send the basic information requested in Ms. Stevenson's initial letter of May 13, 2004. [Doc. 237, David Stephens Dep. at 86-87.] According to the date stamp imprinted on Plaintiffs' theft questionnaire and affidavit, it appears that Defendant received these two documents from Plaintiffs on or about June 11, 2005. [Doc. 189, Ex. CC, DD; Stevenson Dep. at 94-95.] There remained other issues, such as determining whether the car had a salvage title, that were not resolved until after the date stamped on the theft questionnaire. [Doc. 11, Ex. 2, at 79-80; Ex. 6.] Plaintiffs have not shown that the initial delay associated with gathering this preliminary information (which ran until approximately the middle of July 2004) was unreasonable.

Based on the preliminary information that Defendant initially had gathered from Plaintiff and other sources as of mid-July 2004, Plaintiffs' claim presented several "red flags" or indicators of potential insurance fraud. In particular, Ms. Stevenson noted the fact that some of the receipts for aftermarket equipment allegedly installed by the previous owner were dated during the time period that the vehicle was reported as stolen by that previous owner. [Doc. 237, Stevenson Dep. at 37; Stevenson Aff. ¶¶ 9, 10, Ex. G, H; Doc. 205, Stevenson Dep. at 14-15.] Moreover, the deposition testimony of both parties' experts refers to an NICB publication entitled "Indicators of Vehicle Theft Fraud," which lists a number of "red flags" applicable to Plaintiffs' auto-theft claim that indicate possible fraud and merit closer scrutiny. [Doc. 237, Partlow Dep. at 92-103; Zalma Aff. ¶ 3, Ex. A.] While such industry standards or customs codified in the NICB publication are "'not conclusive,'" they

may serve as "'evidence of good or bad faith.'"  Sloan, 2004-NMSC-004, ¶ 14, 135 N.M.

106, 85 P.3d 230 (quoting Allsups Convenience Stores, Inc. v. North River Ins. Co., 1999-

NMSC-006, ¶ 44, 127 N.M. 1, 976 P.2d 1, and citing NMUJI 13-1705 1998).

     To counter this evidence that the additional delay dating from mid-July 2004 was

occasioned by Defendant's insurance fraud investigation, and that such an investigation was

in accordance with industry standards and customs, Plaintiffs point to the preliminary report

of their proposed expert witness, John W. Partlow, dated April 18, 2005.  [Doc. 202, Ex. H.]

Mr. Partlow's preliminary report, however, does not create a genuine issue of material fact

as to the unreasonableness of this additional period of delay for the following reasons.

     First, Mr. Partlow's preliminary report appears to consist of unsworn statements.

Such unsworn statements by a party's proposed expert "'do[ ] not meet the requirements of

Fed. Rule Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a

summary judgment motion."  Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003)

(quoting Adickes v. S.J. Kress & Co., 398 U.S. 144, 158 n.17 (1970)); accord Fowle v. C &

C Cola, 868 F.2d 59, 67 (3d Cir. 1989); see Sofford v. Schindler Elevator Corp., 954 F.

Supp. 1459, 1462-63 (D. Colo. 1997) (collecting cases).

     Second, Mr. Partlow's preliminary report predates his deposition testimony of July

13, 2005, in which he admitted that the NICB is a reliable authority in the insurance industry

and that several of the "red flags" listed in the NICB publication on "Indicators of Vehicle

Theft Fraud" applied to the information Defendant had obtained regarding Plaintiffs' claim.

[Doc. 237, Partlow Dep. at 89-113, 132-33, 142.]  Given that Mr. Partlow's preliminary

report expressly states that it is based on his "review of the documents received to date" and that he will "update his opinions if necessary" as "discovery continues," the only reasonable inference is that his subsequent deposition testimony supersedes his preliminary report to the extent there is any inconsistency between the two.  Under these circumstances, the law does not permit Plaintiffs to use Mr. Partlow's preliminary report to create a "sham fact issue" that contradicts his sworn deposition testimony.  Burns, 330 F.3d at 1282.

Even if Mr. Partlow's preliminary report were to be considered independently from his subsequent deposition testimony, I would conclude in the alternative that the opinions stated therein are inadmissible because they do not come close to meeting the standards of reliability and relevance required under Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999), and Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  Rather than basing his opinions on any objective or peer-reviewed methodology or specific standards such as the NICB publication referenced above, Mr. Partlow's preliminary report consists almost entirely of his own generalized and subjective assessment of what the law requires and which witnesses he believes are more credible.

It is not the role of an expert witness to usurp the jury's task of determining the credibility of witnesses or other evidence, see United States v. Adams, 271 F.3d 1236, 1245-46 (10th Cir. 2001), nor is it the role of an expert witness to usurp the Court's job of determining what the law requires, see Specht v. Jensen, 853 F.2d 805, 807-09 (10th Cir. 1988).  Thus, the opinions of a proffered expert concerning issues of witness credibility or

broad principles of law are of little or no relevance in determining whether a party is entitled to summary judgment.

The opinions in Mr. Partlow's preliminary report also fail to meet the reliability prong of the Daubert/Kumho test. "Although it is not always a straightforward exercise to disaggregate method and conclusion, when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion." Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1233 (10th Cir.2004) (citing General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). Such an analytical gap is present in Mr. Partlow's preliminary report because it does not lay out the intermediate steps in his reasoning that lead him to conclude the delay in payment was attributable to Defendant's bad faith rather than some other, legitimate factor.

In particular, the preliminary report does not identify any objective, peer-reviewed methodology or specific industry standards (such as the NICB publication) on which his opinions are based. Without such methodology or standards, there is no objective way to test whether this delay could be reasonably attributed to other factors (such as a legitimate need for an insurance-fraud investigation, or a lack of cooperation by Plaintiffs).

This analytical gap is widened not only by the preliminary nature of Mr. Partlow's report, but also by its incompleteness. For example, the report attached to Plaintiffs' response brief does not include the list of the specific documents Mr. Partlow reviewed in reaching his preliminary opinions (referenced in the report as Exhibit "B"). Without this list, it is not possible to determine whether Mr. Partlow reviewed the NICB standards noted

above in preparing his preliminary report, and there is no explanation in the body of the report itself as to how these standards were discounted in reaching his opinions.

For all of the above reasons, I conclude that Mr. Partlow's preliminary report falls so short of what is required of expert opinions under the Federal Rules of Evidence that it cannot be used to create a genuine issue of material fact in response to Defendant's summary-judgment motion.  It follows that there is no admissible evidence in the record to support the conclusion that Defendant behaved unreasonably or in bad faith by deferring its decision about whether to pay Plaintiffs' claim in mid-July 2004 pending completion of an insurance-fraud investigation or the collection of further evidence regarding the vehicle's value.

The question remains whether, at the next stage of its investigation, Defendant behaved unreasonably by requiring Mr. Stephens to submit to an examination under oath and to provide an extensive array of personal information at that examination.  Although the parties do not cite New Mexico authorities that are directly on point, the weight of authority from other jurisdictions firmly supports the conclusion that an insured's failure or delay in submitting relevant information to the insurer in an examination under oath or by other means will preclude a claim that the insurer did not comply with the time limits for fulfilling its obligations under an insurance policy. See generally 232 Broadway Corp. v. Calvert Ins. Co., 540 N.Y.S.2d 324, 325 (App. Div. 1989) (collecting New York cases); Cal. Fair Plan Ass'n v. Superior Ct., 8 Cal. Rptr. 3d 746 , 748-50 (Ct. App. 2004) (collecting California cases); see, e.g., Suggs v. State Farm Fire and Cas. Co., 833 F.2d 883, 890-91 (10th Cir.

1987) (interpreting New Mexico law); <u>Jacobson v. State Farm Mut. Auto. Ins. Co.</u>, 30 P.3d

949, 951-52 (Idaho 2001) (interpreting Idaho law).  Under these authorities,

> The right to require the insured to submit to an examination under oath concerning all proper subjects of inquiry is reasonable as a matter of law.  The contractual duty to pay policy proceeds did not arise until plaintiffs provided the information necessary to allow [insurer] to determine whether the accident ... was covered under the terms of the policy.... There can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insureds.

<u>Globe Indemnity Co. v. Superior Court</u>, 8 Cal.Rptr.2d 251, 255 (Ct. App. 1992); <u>accord</u> 14

Lee R. Russ & Thomas F. Segalla, <u>Couch on Insurance</u> § 204:114 (3d ed. 2005) ("[T]here

can be no unreasonable delay until after [the] insurer receives adequate information.").

The requirement that insureds cooperate with the insurer's investigation in this

manner is, of course, limited to situations where "the insurer's requests for information" are

"material to the circumstances giving rise to liability on its part."  <u>Tran v. State Farm Fire</u>

<u>and Cas. Co.</u>, 961 P.2d 358, 363 (Wash. 1998) (citing <u>Pilgrim v. State Farm Fire & Cas. Ins.</u>

<u>Co.</u>, 950 P.2d 479, 483 (Wash. 1997)); <u>cf. O'Neel</u>, 2002-NMCA-028, ¶¶ 9, 131 N.M. 630,

41 P.3d 356 (concluding that a jury could have reasonably inferred that an insurer acted in

bad faith by asking "excessive and unnecessarily invasive" questions that did not relate to

the property covered by the insurance policy).  "Information is material when it 'concerns

a subject relevant and germane to the insurer's investigation as it was then proceeding' at the

time the inquiry was made."  <u>Tran</u>, 961 P.2d at 363 (quoting <u>Fine v. Bellefonte Underwriters</u>

<u>Ins. Co.</u>, 725 F.2d 179, 183 (2d Cir.1984)).

-34-

When, as here, the insured presents a claim that raises a number of "red flags" indicative of potential insurance fraud under objective industry standards, then the insured's financial records become relevant and material to the insurer's consideration of the claim insofar as they provide a mechanism for confirming or dispelling the insurer's suspicions about whether the insured has a financial motive to submit a fraudulent claim.  See id. at 364; Rymsha v. Trust Ins. Co., 746 N.E.2d 561, 563-64 (Mass. App. Ct. 2001) (collecting cases). Financial records documenting the exact amount the insured paid to purchase the vehicle in question also are relevant to determining the vehicle's value when, as here, the insured alleges that the vehicle is a rare or customized model which was purchased with cash shortly before it was stolen.  Cf.  Winters v. Transamerica Ins. Co., 194 F.3d 1321, 1999 WL 699835, at *4-*5 (10th Cir. 1999) (unpublished disposition affirming summary judgment on a New Mexico bad-faith claim where "the coverage issues were difficult and debatable").

The insurer's actions in requesting such information do not become unreasonable or in bad faith simply because at a later time the insurer receives additional information dispelling its suspicions and pays the insured for the disputed value of the claim.  See Suggs, 833 F.2d at 891.   In this regard, it bears repeating that the facts of this case are distinguishable from those in which an insurer completely denies an insured's claim and refuses to pay any amount based on the assertion that the insured failed to cooperate, engaged in fraud or misrepresentation, or otherwise violated the terms of the policy during the investigation of the claim.

-35-

This case also is distinguishable from those in which an insurer refuses to pay a claim even after the insured has promptly and substantially complied with the insurer's requests for information.  Here it is undisputed that Plaintiffs waited until November 3, 2004, to supply some of the most basic items that Mr. Rosales requested in his letter of July 30, 2004, such as the keys to the stolen vehicle which Mr. Stephens had in his possession.  With respect to the purchase price of the vehicle, the most that Plaintiffs ever provided was documentation of a wire transfer from Mr. Stephens' brother in Texas in the amount of $16,000 and an oral explanation of how Mr. Stephens came up with the remaining $15,000 in cash that he allegedly paid to Mr. Chase.

Plaintiffs claim that such information was unnecessary because Defendant could have already determined that the vehicle's value was at least $31,000 from other sources available in mid-July 2004, such as an online service called "Auto Trader."   Again there is an analytical gap between Plaintiffs' premise, *i.e.*, the existence of online markets such as "Auto Trader," and the conclusion they wish to draw from this premise, *i.e.*, that their 1994 Toyota Supra was worth $31,000 in May 2004.  The printout from "Auto Trader" attached to Plaintiffs' response brief only lists an "advertised price range" of $18,000 to $35,000 for 1994 Toyota Supra models; it does not contain any proof of the actual selling price of such vehicles, nor does it contain any authentication or explanation as to the scope or validity of the search result indicated on the printout.  [Doc. 202, Ex. G.]  The "Auto Trader" printout also does not account for Defendant's legitimate need to verify which particular aftermarket parts, if any, were installed on Plaintiffs' vehicle–a matter of significant concern given the

discrepancy between the dates of the alleged receipts for such aftermarket parts and the dates when the vehicle was reported stolen by the previous owner.

Plaintiffs contend that any deficiencies in the "Auto Trader" printout should be overlooked because Defendant also did not base its initial offers on actual sales data for comparable vehicles. To support this contention, Plaintiffs rely on hearsay that Mr. Stephens attributed to an auto salesperson at a dealership in Farmington to which Ms. Stevenson allegedly referred when making her initial offer of $16,000. According to Mr. Stephens' deposition testimony, the salesperson denied ever selling (or offering to sell) a 1994 Toyota Supra for this amount, and this denial contradicted the information he received from Ms. Stevenson. [Doc. 202, David Stephens Dep. at 119-21.] The statements that Mr. Stephens attribute to the auto salesperson in Farmington do not create a genuine issue of material fact because they are hearsay and, as such, cannot be considered in ruling on a summary-judgment motion. See Gross, 53 F.3d at 1541; Starr, 54 F.3d at 1555.

To the extent that Plaintiffs challenge Defendant's methodology for determining the value of the stolen 1994 Toyota Supra by other means, they also have failed to present admissible evidence in support of this challenge. Plaintiffs' proposed expert witness, Mr. Partlow, admitted during his deposition testimony that he did not have any specialized experience in determining the market value of a vehicle and had not been retained to opine on the fair market value of Plaintiffs' 1994 Toyota Supra. Rather, his opinion on this subject was simply based on "the reports that I read." [Doc. 237, Partlow Dep. at 114.] Again, such

an opinion does not come close to meeting the standards of reliance or relevancy required for the admission of expert testimony under Fed. R. Evid. 702.

Because Plaintiffs have failed to present admissible evidence that a reasonable insurer would have known by mid-July 2004 that their 1994 Toyota Supra was worth $31,000, they have failed to meet their burden of proving that Defendant acted unreasonably by requiring them to submit additional information after that date to substantiate their claim. And even if the value of the vehicle could have been determined by that date, the undisputed facts and evidence of record still do not support a reasonable inference that Defendant acted unreasonably by deferring payment on this claim pending completion of an insurance-fraud investigation. For these reasons, Defendant is entitled to summary judgment on Plaintiffs' bad-faith claim and their claim that Defendant violated an implied covenant of good faith and fair dealing.

As Plaintiffs have failed to show the threshold level of unreasonableness necessary to support an insurance bad-faith claim for compensatory damages in excess of the $31,000 they already received from Defendant, it follows that Plaintiffs also fail to show the higher level of culpability required to support an award of punitive damages. See Sloan, 2004-NMSC-004, ¶¶ 23-24, 135 N.M. 106, 85 P.3d 230. Defendant is therefore entitled to summary judgment on Plaintiffs' claim for punitive damages as well.

### D.  **Plaintiffs' Statutory Claims**

I next turn to Plaintiffs' statutory claims under New Mexico's Unfair Claims Settlement Practices Act (UCSPA), N.M. Stat. Ann. § 59A-16-20 (Michie 2004). In order

to plead and prove a viable claim under this statute, Plaintiffs must specifically identify which of its fifteen provisions Defendant is alleged to have violated.  See Yumukoglu v. Provident Life & Accident Ins. Co., 131 F. Supp. 2d 1215, 1228 (D.N.M. 2001), aff'd 36 Fed. Appx. 378 (10th Cir. 2002) (unpublished disposition).

Plaintiffs' *Complaint* alleges that Defendant violated Subsections (B), (C), (D), (E), and (G) of the UCSPA, which prohibits insurers from (1) "failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies," (2) "failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies," (3) "failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured," (4) "not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear," and (5) "compelling insureds to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds when such insureds have made claims for amounts reasonably similar to amounts ultimately recovered."  N.M. Stat. Ann. §§ 59A-16-20(B), (C), (D), (E), (G).  [Doc. 1, *Complaint* at ¶ 22.]  In response to Defendant's summary-judgment motion, Plaintiffs also claim that Defendant violated Subsection (N) of the UCSPA, which prohibits insurers from "failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts

or applicable law for denial of a claim or for the offer of a compromise settlement."  N.M. Stat. Ann. § 59A-16-20(N).  [Doc. 202.]

 To support these allegations, Plaintiffs cite the letter authored by Ms. Stevenson dated July 15, 2004, which states that:  "I have made two offers to settle the theft claim on your 1994 Toyota Supra Turbo Sport . . . and you refused both.  We are retracting the offers at this time to further the investigation of said theft."  [Doc. 237, Stevenson Aff. ¶ 1, Ex. I.] Plaintiffs also cite the letter authored by Mr. Rosales dated December 20, 2004, in which Defendant offered to settle Plaintiffs' insurance claim for $31,000.00.  [Doc. 237, Rosales Aff. ¶ 12, Ex. J.]  According to Plaintiffs, the letter of July 15, 2004, evinces a failure to affirm or deny coverage within a reasonable time as required under Subsection (D) of the UCSPA, and neither letter provides the reasonable explanation required under Subsection (N) of the statute.  [Doc. 202.] Plaintiffs also cite the timing of this lawsuit as evidence that Defendant compelled them to institute litigation to recover the amount due to them under their policy, contrary to Subsection (G) of the UCSPA.

 I conclude that even when the evidence of record is viewed in the light most favorable to Plaintiffs, their UCSPA claims fail for substantially the same reasons articulated above with respect to their bad-faith claims.  The preliminary report of Plaintiffs' proposed expert witness, Mr. Partlow, does not meet the reliability or relevance requirements for admissibility under Fed. R. Evid. 702 and is superseded in large part by Mr. Partlow's deposition testimony.  In addition, Plaintiffs' version of events is not supported by the

evidence of record, and the few portions of the record that Plaintiffs do cite in support of their UCSPA claims are taken out of context.

The record reflects that Ms. Stevenson informed Mr. Stephens of Defendant's investigation during their initial recorded conversation on May 13, 2004.  [Doc. 237, Stevenson Aff. ¶¶ 3, 4, 5, Ex. B.]  Then, after Ms. Stevenson sent her letter of July 15, 2004, explaining that Defendant's offers were retracted to further that investigation, Mr. Rosales sent another letter to Plaintiffs dated July 30, 2004, explaining in greater detail the scope and purpose of Defendant's investigation (including the examination under oath).  In particular, Mr. Rosales explained that his letter was not intended "as a denial or admission of liability or coverage" and requested Plaintiffs' "full cooperation so that the validity and amount of [their] claims can be determined at the earliest possible date."  [Doc. 237, Rosales Aff. ¶ 4, Ex. B.]  Mr. Rosales' subsequent letter of December 20, 2004, also explained that he had undertaken, among other things, "a review of Mr. Stephens' examination under oath testimony and documentation recently submitted"--information which Plaintiffs had not supplied at the time of the earlier settlement offers in July 2004.  [Doc. 237, Rosales Aff. ¶ 12, Ex. J.]

A rational jury could not ignore the portions of the record cited above and rely solely on the stray remarks that Plaintiffs cite out of context in their response brief in order to reach the conclusion that Defendant's communications with Plaintiffs failed to provide a reasonable explanation for its actions, failed to affirm or deny coverage within a reasonable time, or violated other provisions of the UCSPA.  In his deposition testimony and in his

examination under oath, Mr. Stephens did not present evidence to dispute the accuracy of the information obtained or conveyed by Ms. Stevenson during the interview conducted on May 13, 2004.  [Doc. 237, Ex. 3, at 39; David Stephens Dep. at 21-23, 83-84, 86.]  He also acknowledged that he received Mr. Rosales' letter of July 30, 2004.  [Doc. 237, Ex. 3, at 40-41; David Stephens Dep. at 107-09.]  Plaintiffs' counsel admits receiving Mr. Rosales' subsequent letter of December 20, 2004.  [Doc. 12, citing Doc. 11, Ex. 4.]  The content of these letters and interviews speaks for itself with respect to the degree of notice and explanation Defendant provided to Plaintiffs.

The fact that Plaintiffs instituted litigation before Defendant paid them $31,000 also does not support a reasonable inference that Defendant violated Subsection (G) of the UCSPA because this provision of the statute only applies to amounts "ultimately recovered in actions brought by [the] insureds when such insureds have made claims for amounts reasonably similar to amounts ultimately recovered."  N.M. Stat. Ann. § 59A-16-20(G).  The $31,000 in question was not "ultimately recovered" in this lawsuit, as there is no judgment or settlement agreement requiring Defendant to pay this amount or prohibiting the company from continuing to investigate the validity or amount of Plaintiffs' claim after this payment was made.

Plaintiffs ask the Court to construe Subsection (G) as imposing liability on an insurer whenever an insured commences litigation before the insurer pays a claim, even when such litigation is commenced before the insurer has received the information necessary to determine the validity and amount of the claim.  The New Mexico Supreme Court has not

construed the statute so broadly. "[T]he Insurance Code does not impose a duty to settle in all instances, nor does it require insurers to settle cases they reasonably believe to be without merit or overvalued." Hovet v. Allstate Ins. Co., 2004-NMSC-010, ¶ 29, 135 N.M. 397, 89 P.3d 69. "Any insurer that objectively exercises good faith and fairly attempts to settle its cases on a reasonable basis and in a timely manner need not fear liability under the Code." Id.

In reaching these conclusions, the New Mexico Supreme Court noted that the provisions of the UCSPA cited above must be read in conjunction with other provisions of the Insurance Code that are intended to discourage frivolous litigation. See id. (citing N.M. Stat. Ann. § 59A-16-30 (Michie 2004)). Applying the principle that "all provisions of a [statutory scheme], together with other statutes *in pari materia*, must be read together to ascertain legislative intent," Roth v. Thompson, 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992), it follows that the requirements of the UCSPA also must be read in conjunction with provisions of the Insurance Fraud Act (IFA), N.M. Stat. Ann. § 59A-16C-1 to -16 (Michie 2004).

The IFA provides immunity from civil liability to persons furnishing information to "the anti-fraud unit of an insurer," N.M. Stat. Ann. § 59A-16C-7, and requires insurers to prepare and implement an "anti-fraud plan that is reasonably calculated to detect, prosecute and prevent insurance fraud," N.M. Stat. Ann. § 59A-16C-10. These requirements are based on legislative findings that the State must "aggressively confront" and "halt" the problem of insurance fraud. N.M. Stat. Ann. § 59A-16C-2.

-43-

The New Mexico Supreme Court has stated that it "will not construe statutes to achieve an absurd result or to defeat the intended object of the legislature." State v. Herrera, 86 N.M. 224, 226, 522 P.2d 76, 78 (1974). Such an absurd result would occur if the Court were to require insurers to choose between violating the IFA by foregoing aggressive efforts to combat insurance fraud, or violating the UCSPA by failing to immediately pay an insured who threatens litigation regarding a potentially fraudulent claim. In order to effectively carry out the purposes of both statutes, the requirements for prompt payment of a claim under the USCPA must be flexible enough to accommodate an insurer's investigative duties under the IFA when, as here, the insurer has objective information which gives rise to a reasonable suspicion of insurance fraud or overvaluation based on recognized industry standards. For these reasons, I conclude that Defendant also is entitled to summary judgment on Plaintiffs' statutory claims under the UCSPA.

As Plaintiffs have not shown that Defendant acted unreasonably or that they were required to commence litigation in order to receive the payment of $31,000 that Defendant offered in December 2004, it follows that Plaintiffs are not entitled to an award of attorney fees under N.M. Stat. Ann. § 39-2-1 (Michie 2004) or any provision of the Insurance Code. New Mexico's fee-shifting statute "is not aimed at holding out the threat of an award of attorney's fees any time an insurer challenges any issue" regarding an objectively difficult or debatable claim. Amica Mut. Ins. Co. v. Maloney, 120 N.M. 523, 531, 903 P.2d 834, 842 (1995); accord Suggs, 833 F.2d at 893. In this case, the $31,000 payment did not result from a judgment or as part of a settlement agreement, and this *Memorandum Opinion and Order*

should not be construed as precluding Defendant from continuing its investigation of the validity or amount of Plaintiffs' claim after the date on which this payment was made.

## III.   **CONCLUSION**

For the foregoing reasons, Plaintiffs have not come forward with admissible evidence to support each essential element of their claims, and therefore Defendant is entitled to summary judgment.  Because Defendant is entitled to summary judgment on these grounds alone without reliance on any affirmative defenses, Plaintiffs' motion for partial summary judgment is denied as moot.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. No. 191] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' *Opposed Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment on  GEICO's Affirmative Defenses and Memorandum in Support* [Doc. No. 189] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED WITH PREJUDICE** as to all claims.

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, January 17, 2006, at 9:00 a.m., the **CALL OF THE CALENDAR** set for THURSDAY, February 9, 2006, at 9:00 a.m., and the **JURY SELECTION/TRIAL** set for TUESDAY, February 14, 2006, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED**, this 22nd day of December, 2005, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge